CHIEF JUSTICE WILLIAMS
delivered the opinion of the majority op the court,
JUDGE ROBERTSON dissenting:
It is a well-established and undoubted fact, that when the vendor contracted the land to Jane Early and Henry Tuggle, and agreed to convey it to their children, Marshall Early and John Tuggle, a lien was to be reserved for the unpaid purchase price, and both contracting parties instructed the draftsman to so draw the deed as to secure this lien; and when he had drawn it, he then assured the parties that the language used did secure such lien, it stating the amount of the consideration, “paid and to he paid,” without specifying how much remained unpaid, all fortified by the then insolvency of Henry Tuggle, who died soon after wholly insolvent.
This language, before our revision, would have secured the vendor’s lien; but since the revision of our statutes, no vendor’s lien is secured when the title is conveyed, “ unless it be expressly slated in the deed what part of the consideration remains unpaid.” (2 Slant. Rev. Slat., 230.)
Both the notes sued upon are dated the same day of the deed, and one recites that it is given in part pay for a certain tract of land this day deeded to John Tuggle and Marshall Early.
As the vendor seeks to reform the deed, and then enforce his lien, it presents the single question of legal power in the chancellor to do so.
This case presents a mutual mistake of law and fact by both the contracting parties and draftsman; and though the. land was conveyed to the minor children of the purchasers, yet, as they are mere volunteers, they stand in *171 no more favorable attitude, nor have they higher equities, than if it had been conveyed to the parents.
Whatever may be said as to the danger of admitting parol or extraneous evidence to contradict, alter, or add to written instruments, it is now settled, by such an overwhelming current of authority, both in the American States and England, that this may be done when, through mistake, oversight, or fraud, the written memorial does not truly set out the contract, as scarcely to be regarded as longer an open question. But all the authorities agree that such evidence is to be cautiously received, and the case clearty made out, else the courts should hold to the written memorial as the highest and best evidence of the contract; but when it thus does appear, the written memorial, instead of attesting an agreement voluntarily entered into by the contracting parties, makes for them a bargain which the mind of neither party ever assented to, and to hold the injured party bound would simply make a rule of evidence, intended to secure justice, instrumental in perpetrating the grossest fraud.
After a long struggle, in which honesty, good faith, and integrity were attempting to free the administration of justice from fraul, chicanery, and unconscientious advantages, to- be obtained through a too strict adherence to a very salutary rule of evidence, the true philosophy of the rule was determined perfectly consonant with the just stability of written instruments and the strictest integrity, by admitting the above named exceptions. But as those willing to avail themselves of unconscientious advantages are always seeking, with watchful vigilance, to secure such benefits, by either rules of property or of evidence, the next great struggle in which integrity, honesty, and fair dealing had to meet the same wary, watchful chicanery, in attempting to protect its uncon *172 sciéntious advantages under the rules of law, was upon the statute of frauds and perjuries, which substantially declare, among other things, that no suit should be brought against the party to be charged for any sale of real estate, fyc., unless upon some memorandum, in writing; signed by him.
The developing science of the law, and its ever-waxing love of justice, increasing the omnipotence of the chancellor for equitable purposes, soon settled that this statute in nowise modified the above named exceptions to the rule of evidence, nor curtailed the equitable jurisdiction of courts.
But still, with more plausibility and seeming adherence to law, it was contended that even when, by mistake, oversight, or fraud, the deed of conveyance did not conform to the real contract of the parties, that all the chancellor could do would be to cancel the deed, and put the parties in statu quo; that to reform the deed, and then enforce a specific performance, would be to render the statute nugatory, whilst it was conceded that any unfair provision inserted for the vendee’s benefit, not according to the contract, could be modified, and the deed made to conform to the real intention of the parties; yet, when any advantageous covenant in his favor had been left out, that the chancellor was powerless to enforce it,-thus making a statute professedly enacted to prevent fraud, often the instrument of the grossest deception and injustice; and though the English courts first went off on this line of construction, yet the advancing science of the law, and the ever-operating influences of justice to rid it of all technicalities calculated to foster fraud and suppress impartial justice, have induced the English courts, in more modern times, to depart from this line of adjudi *173 cation, and to recognize the power to reform the deed, and then enforce it according to the real contract.
The rale thus early adopted by the English courts lacked the great and essential element of mutuality; for it often happened that the parties could not be put in statu quo, and then the vendee was made to suffer the consequences of an innocent mistake or a fraud, and abide by a contract to which his mind never assented.
But to the honor of American jurisprudence it may be said, that its judicial mind, inspired with a devoted love of justice, and less embarrassed with the mere letter, better appreciated the spirit of the statute, hence their earlier advancement to the administration of its true equity and spirit, unencumbered by its mere letter, and that, too, more in consonance with the science of equity jurisprudence.
Mr. Justice Story, in his work on Equity Jurisprudence {vol. 1, sec. 152), says: “ One of the most common classes of cases in which relief is sought in equity, on account of a mistake in fact, is that of written instruments, either executed or executory. Sometimes, by mistake, the written agreement contains less than the parties intended; sometimes it contains more, and sometimes it simply varies from their intent by expressing something different in substance from the truth of that intent. In all such cases, if the mistake is clearly made out by proof entirely satisfactory, equity will reform the contract, so as to make it conformable to the precise intent of the parties."
Again, in section 154, he says: “The danger of setting aside the solemn engagements of parties, when reduced to writing, by the introduction of parol evidence, substituting other material terms and stipulations, is sufficiently obvious. But what shall be said where those terms and stipulations are suppressed or omitted by fraud or imposi *174 tion? Shall the guilty party be allowed to avail himself of such a triumph over innocence and credulity, to accomplish his own base designs? That would be to allow a rule, introduced to suppress fraud, to be the most effectual promotion and encouragement of it, and hence courts of equity have not hesitated to entertain jurisdiction to reform all contracts, where a fraudulent suppression, omission, or insertion of a material stipulation exists, notwithstanding, to some extent, it breaks in upon the uniformity of the rule as to the exclusion of parol evidence to vary or control written contracts, wisely deeming such cases a proper exception to the rule, and proving its general soundness.”
And in the next section he says: “It is upon the same ground that equity interferes in cases of written agreements, where there has been an innocent omission or insertion of a material stipulation, contrary to the intention of both parties, and under a mutual mistake. To allow it to prevail in such a case would be to work a surprise or fraud upon both parties, and certainly upon the sufferers ; as much injustice would, to the full extent, be done under such circumstances as would be done by a positive fraud or an inevitable accident.
“A court of equity would be of little value if it could suppress only positive fraud, and leave mutual mistakes, innocently made, to work intolerable mischiefs contrary to the intention of parties. It would be to allow an act, originating in innocence, to operate ultimately as a fraud, by enabling the party, who receives the benefit of the mistake, to resist the claims of justice, under the shelter of a rule to promote it. It would be a great defect in the moral jurisdiction of the court, if, under such circumstances, it were incapable of administering relief.” And in section 158 he says: “ Many of the cases included under this head (mistake) have arisen under circumstances wdiich brought *175 them within the reach of the statute of frauds, which requires certain contracts to be in writing; but the rule as to rejecting parol evidence to contradict written agreements, is by no means confined to such cases. It stands as a general rule of law, independent of that statute. It is founded upon the ground that the written instrument furnishes better evidence of the deliberate intention of the parties, than any parol proof can supply; and the exceptions to the rule, originating in accident and mistake, have been equally applied to written instruments within and without the statute of frauds.” (Motleux vs. London Assurance Com,., 1 Atk., 545; Hinkle vs. Royal Exchange Assurance Co., 1 Ves., 317; Leyman vs. U. S. Ins. Co., 2 John’s Chy. Rep., 630; Head vs. Boston Mar. Ins. Co., 2 Cranch, 419, 444; Mar. Ins. B., chap. 8, sec. 4; Andrews vs. Essex Fire and Mar. Ins., 3 Mason’s Rep., 10; Delaware Ins. Co. vs. Hagan, 2 Wash. Cir. Rep., 5.)
Story (sec. 159) again says: “The relief granted by courts of equity in cases of this character is not confined to mere executory contracts, by altering and conforming them to the real intent of the parties, but it is extended to solemn instruments which are made by parties in pursuance of such executory or preliminary contracts; and, indeed, if the court acted otherwise, there would be a great defect of justice, and the main evils of the mistake would remain irremediable; hence, in preliminary contracts for conveyances, settlements, and other solemn instruments, the courts act efficiently by reforming the preliminary contract itself, and decreeing a due execution of it, as reformed, if no conveyance or other solemn instrument in pursuance of it has been executed; and if such conveyance or instrument has been executed, it reforms the latter also, by making it such as the parties originally intended and various authorities are referred to.
*176 In section 161, in answer to the disinclination of the British courts to receive parol evidence to reform and enforce written instruments, Story says: “ But it is extremely difficult to perceive the principle upon which such decisions can be supported, consistently with the acknowledged exercise of jurisdiction in the courts to reform written contracts and to decree relief thereon.”
In America, Mr. Chancellor Kent, after a most elaborate consideration of the subject, has not hesitated to reject the distinction as unfounded in justice, and has decreed relief to a plaintiff standing in this precise predicament.
Mr. Chancellor Kent has forcibly said: “That it cannot make any difference in reasonableness and justice of the remedy, whether the mistake was to the prejudice of one party or the other. If the court has a competent jurisdiction to correct such mistakes, and that is a point settled, the agreement, when corrected, and made to speak the real sense of the parties, ought to be enforced as well as any other agreement, perfect in the first instance.” It ought to have the same efficacy, and be entitled to the same protection, when made accurate under the decree of the court, as. when made accurate by the act of the. parties. (Kisselback vs. Livingston, 4 John. Chy. R., 148.)
In Wiswall vs. Hall, 3 Paige, 313, where the defendant, being the owner of a certain lot, No. 22, bounded on the Hudson river at the line of tide water, had obtained a grant from the corporation of the right to, and did erect, a wharf in front of his lot. He then sold the premises to complainant, and conveyed them as lot No. 22, as the same was described in and had been occupied and held under a certain deed which was particularly described. Now this lot No. 22 did not embrace the wharf, nor was it conveyed in the deed described; but the defendant held *177 it under a grant from the corporation. The defendant, by Ms answer, insisted that he did not intend to sell anything more than the lot as it originally was. The chancellor said he was satisfied, from the evidence, that this allegation was true; but he was also of opinion that the defendant knew that the plaintiff did not so understand the bargain, and that, although he assented to take a conveyance limited to lot No. 22, it was only because he believed that lot and the conveyance embraced the wharf, and he decreed that the defendant should execute a release thereof.
In De Peyster vs. Hasbrouck (1 Kernan, N. York R., 587), the appellate court of New York directed the reformation of a mortgage of real estate, and enforced a lien thereon, because valuable erections, which the mortgage supposed' were mortgaged, stood on adjoining ground to that actually described in the deed, these being appraised before the mortgage was executed at six thousand five hundred dollars, and the mortgagee loaning twelve thousand doldollars, supposing the mortgage included these, with the other premises, and reversed the decision of the supreme court refusing to reform the mortgage, and then to enforce it, because they believed it inconsistent with the statute of frauds. The New York appellate court, referring to the case of Weswall vs. Hall, said : ‘‘ This case is upon principle identical; and it is unnecessary to refer to cases to establish the familiar doctrine that where, through- mistake or fraud, a contract or' conveyance fails to express the actual agreement of the parties, it will be reformed by a court of equity so as to correspond with such actual agreement.”
And in Rider vs. Powell (28 N. Y. R., 312), after due consideration, the appellate court of New York held, *178 that where a mortgage of real estate had been executed to secure ten annual payments of three hundred dollars each, but had, through mistake, left out the annual interest on the entire sum of three thousand dollars, that it should be reformed and specifically enforced.
In Hunter vs. Bilyeu, &c. (30 Ill., 246), the Supreme Court of Illinois, after thorough argument, decided that the vendee, upon bill filed against the heirs of the vendor, could have a bond reformed so as to include lands left out by mistake in the description of several tracts, and was entitled to a specific enforcement of the reformed bond, and, therefore, directed a conveyance of the tracts left out.
In Huffman vs. Fry et al. (5 Jones’ Equity R., 415), the Supreme Court of North Carolina held, at the instance of the mortgagee, that the mortgage could be reformed and specifically enforced against the general creditors, it clearly appearing that the mortgage, through mistake, was made to secure one dollar instead of one hundred dollars.
The two New York, the Illinois, and the North Carolina cases, were instances of reformation sought by the vendees against the vendors, and were clearly within the statute of frauds.
In Brown vs. Lampton (35 Vt., 258), the vendor sought the reformation of the deed of conveyance, because it conveyed the tract of land sold, together with all its appurtenances, without reservation; whereas, by the contract the vendor was to retain the right to use the water from a spring, and to convey it through acqueducts to several houses owned by him, situated near by; but which reservation, by mistake, was left out. The Supreme Court of Vermont directed the vendee to recon *179 vey this right to use the spring, though he denied the mistake.
This court, in Athy vs. McHenry (6 B. Mon., 59), directed a perpetual injunction as to Athey and his subsequent vendees against erecting any building on ten feet front of a lot in the city of Louisville, so as to exclude air and light from the house of his vendor, McHenry, it being shown that when the latter sold him the strip of ten feet it was agreed that the front was to remain an open space, and not to be covered by any building, so as to exclude air and light from the vendor’s house; but this was left out of the deed of conveyance by mistake. Nor will it do to say, in response to this decision, that the statute of frauds was not alluded to, for as the statute had no application to the case, there was no need of reference to it.
And in Thomas vs. McCormack (9 Dana, 108), this court, expounding the rules governing writings and deeds, said that parol evidence could be heard as against them, either for fraud or mistake, when asserted in the pleadings, and could be relieved against.
In Bates et al. vs. James' heirs (MSS. Opin., last term), this court reversed the chancellor’s judgment in rescinding a contract of exchange of Jefferson county, Kentucky, for Mississippi lands, because the deed, by mistake, described lands in Mississippi six miles from where the lands sold were situated; yet the vendor, offering to correct the mistake, this court directed it to be done, and the vendee held thereto. And, at the present sitting, this court, in Mourning vs. Stratton, has held, that when a vendor had assigned the vendee’s note before he conveyed by deed, of which the vendee had notice, that a subsequent conveyance by the vendor, without specifying the note held by his assignee, was a fraud upon the holder of the note, and did not waive his lien.
*180 And in Mattingly and wife vs. Speak et al. (4 Bush), this court held, that where a father, intending to convey land to his married daughter and the heirs of her body, through mistake conveyed it to the son-in-law and his heirs, the deed could be reformed, even after the death of both the grantor and grantee, upon clear and satisfactory evidence of the mistake.
The provision of the statute of frauds is, that no suit shall be brought to charge any person, “ upon any contract for the sale of real estate, or any lease thereof for a longer term than one year, unless the promise, contract, agreement, &c., or some memorandum or note thereof, be in writing, and signed at' the close thereof by the party to be charged.”
It will at once be perceived that this suit is not to charge any person upon any contract for the sale of land, but it is a suit by the vendor to correct a mistake in his own deed, by which he conveyed aright — rather by which he waived a right — in himself contrary to the contract, and clearly does not fall within either the letter or spirit of the statute of frauds, but belongs peculiarly to that class of cases wherein courts of equity reform and specifically enforce the reformed contract, for fraud, omission, or mistake.
It has never been held that when the vendor had delivered to the vendee his memorandum in writing on the sale of land, that he must have a memorandum in writing to enable him to recover the purchase price, because, even the statute of frauds does not require this; but no one can be compelled to convey lands, unless the sale be attested by a writing; when, however, a contract of sale is so attested, though, through fraud or mistake, the real sale, as made, is not set forth, yet the current of American authorities recognize the power and duty of the *181 chancellor to reform the writing, and then enforce it, when certainly coming within the provisions of the statute ; but when it does not come within the purview of the statute, as this case docs not, there is no contrariety of adjudicated authority in Eng'land or Amei’ica; for it then falls within the general jurisdiction of the chancellor to correct for fraud, omission, or mistake, unqualified by the statute, also justified by the same exceptions to that rule of evidence which recognizes written as of higher and more reliable testimony than parol, equally recognized by the courts of both countries.
After the contract of sale, and until the deed was executed and delivered, the vendor, bf the laws of this State, had a lien for the unpaid purchase price. This lien, it was contracted, should be continued, and not waived by the deed, and the draftsman was instructed to so draw it; and he and the parties thought it was so drawn. No third innocent party, as purchaser for a valuable consideration, is involved. To say that the vendor lost his lien beyond the power of the chancellor to allow and enforce it, is to make the law an agent of fraud and the chancellor an imbecile in the administration of justice, likewise to destroy every principle upon which contracts are upheld and regarded, as neither the mind of the one nor the other party assented to such a contract; beside, there was no consideration contracted or paid to uphold it; but simply, by mistake, the deed sets out a contract never made; and when the vendor seeks to enforce the real contract, the vendee meets him with the deed, and a denial of the right of the court to investigate it, or of the vendor to show mistake, omission, or fraud, and that, too, in a case not within the statute of frauds.
Before our revision almost anj"- vague expression in the vendor’s deed, showing that all the purchase money had *182 not been paid, was held sufficient to put subsequent vendees upon their guard, such as used in this deed, of “paid and to be paid f hence, after vendees, who had paid all the purchase price to their vendors, were often surprised by the assertion of a lien by some remote vendor, and thus injustice was sometimes done to remote vendees. To remedy this evil, our Revised Statutes require the amount of the vendor’s unpaid purchase price to be specified in his deed of conveyance, else his lien is thereby waived; but, as between the original parties or volunteers under them, this was never intended either to work a fraud, to alter the rules of evidence, nor to take from the chancellor one of his most valuable jurisdictions.
It is said by Story, and is a most just and reasonable rule, that, in the reformation of deeds, the just rights and equities of third and innocent parties, purchasers for a valuable consideration, without notice, are not to be disturbed; for, as between vendor and innocent remote vendees, the loss should fall on the one who, through his own negligence, may, to some extent, be regarded as the author of the misfortune. The evidence of the draftsman alone, since the adoption of our Civil Code, is sufficient to establish the allegation of mistake, though denied in the answer.
Section 142, Civil Code, requiring that the pleadings, with certain exceptions, should be verified, provides “that such verification shall not make other or greater proof necessary on the side of the adverse party.”
And in Albro vs. Lawson (17 B. Mon., 644), this court held, that the rule which required two witnesses, or one witness, with strong corroborating circumstances, to overcome a denial in an answer in chancery, has been changed by said section of the Code, which was subsequently *183 affirmed by this court in Enders vs. Williams (1 Met., 354-5). So it may now be regarded that the oath of the plaintiff and the defendant making an issue, are equivalents, and the issue to be adjudicated upon the evidence. But one witness testified in this case — the draftsman. There are no contrariety of facts, but the language of the deed, the insolvency of the purchaser, Henry Tuggle, both signally confirm the positive and emphatic statements of the only witness that a lien was contracted for, and was to be retained, and was to be set out in the deed, and that all the parties thought it was so set out.
Wherefore, the judgment is reversed, with directions to reform the deed and allow the lien, selling first the undivided interest of Jno. Tuggle for that purpose.
Judge Robertson dissenting.