Chief Justice Robertson
delivered the Opinion of the Court.
Horace Cleland, husband of one of the heirs of John Irvine, deceased, was, in 1818, appointed guardian for Priscilla and Robert, two infant children, and the. only-remaining heirs, of the decedent; and executed a guar? dian’s bond, with the ordinary condition, with Joseph McDowell as surety.
In 1823, during the minority of the wards, they and their guardian, in right of his wife, being entitled to a tract of land of which he was possessed, sold it to one Davis Caldwell, and took his bonds for the price, payable,in instalments, jointly to themselves, and afterwards assigned the bond's to another person—Cleland for himself, and Robert and Priscilla by him as their guardian.
Afterwards, tp-wit, in 1831, the wards having become twenty-one years of age, and Cleland having died insolvent—this suit at law was brought, against McDowell, on the guardian?s bond, to recover the price of the land, to which the plaintiffs in the action claimed to be entitled, and which, as they averred, had been received by their said guardian, and never paid to them.
Upon the trial, the Circuit Court instructed the jury, that McDowell, as surety, was not responsible for the price of the land; and therefore, verdict and judgment Were rendered in his favor.
“An action cannot be sustained on a guardian’s bond,' executed before the passage of the act of 1813, authorizing the sale of real estate of infants—for the proceeds of aside made under that act”—as held in p. case, 4 Litt, 1.
The instruction given by the Circuit Judge, presents the only question we shall consider; for whether the guardian ever received any portion of the price to which, the plaintiffs were entitled—although a question of doubt —was a matter which the jury alone had a right to determine.
In Grimes vs. the Commonwealth, for Clay, (4 Littell's Repts. 1,) our predecessors virtually decided, that a guardian’s surety, in an ordinary bond, is not responsible for the price of the ward’s land sold with the ward’s sanction; and after suggesting that, in fixing the penalty of guardian’s bonds, the County Courts never take into consideration the value of land, but the rents and profits only, and that liability for the value of land belonging to w'ards is never contemplated by the sureties in such bonds—the Court used the following language: “If, how- “ ever, we are correct as to the nature and extent of “ the obligation which .the law required to be taken of “ H. C. Clay (as guardian,) such alatitudinous construc- “ tion of those expressions contained, in the condition of “ the bond, cannot be permitted to prevail. The requisitions of the law regulating the execution of such “ bonds will be more literally fulfilled, and no violence “done to what was most probably intended by thepar- “ ties, by restricting the import of those expressions in it the bond to such estate of the infant, George Clay, as “ might, according to the law in force at the date of the “ bond, be rightfully received by the said H. C. Clay, in “ his general capacity of guardian, and which might, at “ any time, be due from him in that character. And such “ seems to have been the construction which the Legisla- “ ture of 1813 supposed would be given to the bonds of “guardians previously executed; for although, by an act “ of that date, the Legislature have authorized the Cir- “ cuit Courts, on the petition of guardians, to decree the “ sale of the real estate of their wards, it appeal’s not to “have been contemplated by the makers .of the law, t‘ that the proceeds of such a sale should be received by “ the guardian, upon his general responsibility for the csíí tate of his ward.”
’(The condition of the bond in this case, is substantially *631 that of the bond in the case just quoted from; and it was doubtless on the authority of the opinion in that case,-that the Circuit Court gave the instruction now complained of in this.
It is the duty of* a guardian to take care of the estate of his wards; and especially of their land, and make that profitable; he has no right to assent to, or permit, a sale of it, by the wards; nor allow more than the profits to be consumed, for their support.
It is no part of the duty of .a guardian to receive the proceeds of the sale of bis ward’s land. His bond is not intended to cover such money Iftheland is sold, and the proceeds cometo the hands of the guardian, his liability for it, is merely personal —his security is not liable.
The opinion in that case is certainly not conclusive authority for the instruction; but, in the absence of any opposing authority, it is entitled to great respect, and more especially, as we concur in the general principle which it recognizes.
A statutory guardian is both tutor and curator; and the chief object of his appointment is to take care of the estate of his ward. It is his duty not to permit the ward to dispose of, or control, the estate; and he has no right to allow the ward to use more than the profits- for maintenance and education.
And this is especially so in respect to land. It is the duty of the guardian to keep it, and make it productive. He has no right to sell or exchange it. And if he sanction a sale of it by the ward, and surrender the possession of it to the purchaser, he is guilty of a breach of fiducial duty, and frustrates the object of confiding it to his care and control—that is to save it, and make it profitable, until the wardship shall have terminated.
It seems to us to be a necessary consequence, from the foregoing unquestionable proposition, that it cannot be the duty of a guardian to receive, as guardian, the price for which his ward may have sold land confided to Ids custody to keep, and not to sell, or suffer to be sold, by the ward.
And if it were not the duty of Cleland to receive the proceeds of sale as guardian of the plaintiffs, it seems to us almost self-evident, that McDowell is not responsible; for he should not be held liable for money received by Cleland, which it was not his duty, as guardian, to receive, and which, in fact, he ought not to have received; and which, too, in the language just quoted, was not lhdghifully” received. The receipt of sucli money, under such circumstances, was not an official act done on official responsibility; but was altogether a personal act, in violation of official trust, and done on personal re *632 sponsíbility; And a surety guaranties on!y the official conduct of the guardian.
the guardian, fouys the ward’s land of him, or sells it to another, the ward’s •:only security (in addition to the personal responsibility of the guardian., when he has received the p"ice,) is in his right to dis-affirm the contract, after he & hold the land! Query— wheth could^be Smade liable for tiie rents and profits.
Moreover, as was suggested in the case in 4 Lillell, it seems to us that, in executing the official bond, the value of the land, or responsibility for it, was not contemplated by the County Court, the law, dr the parties; and therefore should not be considered as embraced by the condition of the bond, as it was understood and intended to operates
If a guardian may, as guardian, approve a sale of land t>y his ward, he may sell it himself; for it must be felt at once, that there can be no essential difference between selling, and sanctioning a sale and surrendering to the purchaser the possession and use of the land; for if guardians could “rightfully” sanction such sales, and substitute the keeping of money for that of land, it would be easy for them to sell under cover of the ostensible and procured intervention of their wards.
And therefore, we repeat that a guardian has no right to permit a sale and surrender of his ward’s land. And if he do so, and voluntarily and improperly receive the price, in lieu of the land, he is not responsible, as guardian, for that price, so received; and his surety is not, of course, responsible for the money»
If the guardian himself buy the land of his ward, is his surety liable for the price? Certainly not. The ward’s security is the land itself, and his elective right to restitution of it. He eannot, when he becomes twenty-one years old, make the surety responsible by electing to confirm the voidable sale. He then is competent to act for himself; and if, knowing that he may hold his land, or look to his guardian personally for it, he elect to confirm his contract and take the personal obligation of
the purchaser, he cannot bind the guardian’s surety. Is there any essential difference between that ease and this? We think not. Here the proper security of the wards was their right to hold their land, or recover it in an action of ejectment. And they eannot even hold the gurety ]¡aye for the guardian’s breach of duty in surrendering the land; because the land itself, still being theirs, if they had elected to take it, was their appropriate and *633 only security, and therefore, they cannot be prejudiced by the sale, unless they prejudice themselves, by a voluntary confirmation of the sale. Possibly the surety might be liable for the rents and profits; but were that conceded, it would not effect this suit.
The purchaser of tate^pays*, the money — either guardian, at his peril; he runs the risk of the ward’s disaffirm““of the contract.
If Caldwell paid the entire price of the land to Cleland, he did so at his peril. If he paid it to the wards themselves, he risked all legal contingencies.
And if the plaintiffs have ratified the sale, théy must look to Cleland’s personal liability for the price, if he . . * , ,11, , , ever received it. 1ms they should be presumed to have knownwhen they were competent to decide whether they would give up the land, or take the chances of getting the price.
Judgment affirmed.